# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### DOCKET NO.: 3:05CR240

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| DANIEL DEDRICK, | ) | |
| JOHN WESLEY RASMUSSEN, II,[1] and | ) | |
| D&C's ASSAULT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the following motions and memoranda: (1) Defendants' Motions to Set Aside Verdicts and for Judgments of Acquittal, and in the alternative, Motion for Judicial Determination Regarding Statutory Penalties, filed December 19, 2006 [Doc. # 72]; (2) Government's Brief in Opposition to Defendants' Motions to Set Aside Jury Verdict, for Judgments of Acquittal, and for Judicial Determination Regarding Statutory Penalties, filed January 5, 2007 [Doc. # 73]; and (3) Defendants' Memorandum in Support of Defendants' Motion to Set Aside Verdicts and for Judgments of Acquittal, and in the alternative, Motion for Judicial Determination Regarding Statutory Penalties and Reply to Government's Response, filed March 5, 2007 [Doc. # 74].

Having carefully considered the arguments, the record, and the applicable authority, for the

---

[1] The second Defendant, John Wesley Rasmussen, II, was originally named as a Defendant but all counts as to him came to be dismissed. A Three Count  Information charging him with failure to maintain records under 18 U.S.C. § 922(m) (case no. 3:06cr182) was filed on July 7, 2006. He pled guilty on July 12, 2006 by way of a plea agreement which called for dismissal of all counts against Rasmussen in the instant case.  A judgment sentencing him to twelve months probation was entered on June 14, 2007. It dismissed all counts against him in the instant case.

reasons stated below, the Court will <u>deny</u> Defendants' Motions to Set Aside Verdicts and for Judgments of Acquittal, and Motion for Judicial Determination Regarding Statutory Penalties.

## I. PROCEDURAL BACKGROUND

On May 25, 2005, the Federal Government charged Daniel Dedrick ("Dedrick"), John Wesley Rasmussen, II ("Rasmussen"), and Dedrick's business, D&C's Assault Technologies, Incorporated ("Assault Technologies") in a twelve count Bill of Indictment with committing several violations of federal firearms laws. Assault Technologies was the registered holder of a Federal Firearms License as a Dealer in Firearms Other Than Destructive Devices. On December 13, 2005, in a Superseding Bill of Indictment, the Federal Government charged Dedrick with one count of possession of a machine gun in addition to the twelve original counts against the defendants.

The indictment charged in Count One that from on or about January 2003 and continuing through on or about October 2004, in violation of 18 U.S.C. § 371, Dedrick, Rasmussen and unnamed others conspired to: (a) knowingly transfer a firearm, other than a rifle, to a resident of a State other than North Carolina, in violation of 18 U.S.C. § 922(b)(3); (b) knowingly transfer a firearm or ammunition to a prohibited person in violation of 18 U.S.C. § 922(d)(1); and (c) knowingly make a false statement or representation in the records of a Federal Firearms Licensee in violation of 18 U.S.C. § 924(a)(1)(A). Counts Two, Three and Four charged Dedrick and Assault Technologies with knowingly transferring firearms and ammunition to a person to whom they were prohibited from transferring firearms and ammunition, as well as aiding and abetting the same, in violation of 18 U.S.C. §§ 2 and 922(d)(1). Counts Five charged Dedrick and Assault Technologies and Count Six charged Dedrick and Rasmussen and Assault Technologies

with knowingly making false statements and representations in the records Assault Technologies was required to keep as a Federal Firearms Licensee, as well as aiding and abetting the same, in violation of 18 U.S.C. §§ 2 and 924(a)(1)(A). Counts Seven and Eight charged Assault Technologies and Rasmussen with additional violations of 18 U.S.C. §§ 2 and 924(a)(1)(A). Count Nine charged Assault Technologies with willfully selling a firearm to a person who it knew or had reason to know did not reside in North Carolina in violation of 18 U.S.C. §§ 922(b)(3) and 924(a)(1)(D).[2] Counts Eleven and Twelve charged Assault Technologies with knowingly selling firearms to a person after receiving information from the National Instant Criminal Background Check System that the sale of the firearms to the person had been denied, in violation of 18 U.S.C. §§ 922(t) and 924(a)(5). Count Thirteen charged Dedrick with knowingly and unlawfully possessing a machine gun in violation of 18 U.S.C. § 922(o).

A five-day jury trial was held beginning on December 4, 2006. At the close of the Government's case, the Court granted Defendants' Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29(a) as to Counts Two, Three and Four, and the Second Object of Count One. The Court submitted the remaining counts to the jury. The jury returned a verdict of guilty on all remaining counts against both Dedrick and Assault Technologies.

Defendants Dedrick and Assault Technologies timely filed the Motions now before this Court. Defendants request that the Court set aside the verdicts against the Defendants and for judgments of acquittal on the grounds that the Government presented insufficient evidence to sustain the convictions. In the alternative, Defendants request a determination that Defendants be subject only to misdemeanor penalties as to certain counts.

---

[2] Count Ten, since dismissed, charged only Rasmussen.

## II.  STANDARD OF REVIEW

When a defendant challenges a jury's verdict on the grounds of insufficiency of the evidence, the verdict "will be sustained if, when the evidence is viewed in the light most favorable to the Government, there is substantial evidence to support it." *United States v. Sullivan*, 455 F.3d 248, 260 (4th Cir. 2006) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).  "'[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *Id*. (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). Moreover, in conducting the review, the Court must "remain cognizant...that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented."  *Id*. (Internal quotation marks omitted).

## III.  DISCUSSION

### A. Count One: Conspiracy to Transfer Firearms to Out of State Persons and/or Make False Statements in the Records of a Federal Firearms Licensee in Violation of 18 U.S.C. § 371

Defendant Dedrick contends that the jury verdict against him as to Count One should be set aside because the Government presented "no evidence of any agreement or understanding between Dedrick and [his employee] Rasmussen, or any other party . . . to commit such offenses, nor that Dedrick deliberately joined a conspiracy." (Def. Motion to Set Aside Jury Verdicts ¶ 3).

Count One of the Government's Superseding Bill of Indictment reads in relevant part:

From in or about January 2003 and continuing through in or about October 2004, in Union County, within the Western District of North Carolina and elsewhere, the defendant(s): (1) Daniel Dedrick; (2) John Wesley Rasmussen, II, did knowingly and willfully combine, conspire, confederate and agree together with other persons, known and unknown to the Grand Jury, to commit offenses against the United States:

C. To knowingly make a false statement or representation in the records of a Federal Firearms Licensee in violation of Title 18, United States Code, Section 924(a)(1)(A).

(Superseding Bill of Indictment ¶ 10).

The Court stated in its instructions to the jury, that in order for the jury to find Defendant Dedrick guilty of Count One, Conspiracy to Transfer Firearms to Out of State Persons and/or Make False Statements in the Records of a Federal Firearms Licensee in violation of 18 U.S.C. § 371, the Government must prove the following essential elements beyond a reasonable doubt:

> One: That the conspiracy described in the Superseding Bill of Indictment was an agreement or understanding between two or more persons, that the conspiracy was willfully formed, and that it was existing at the time alleged in the Superseding Bill of Indictment.
> Two: At some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the agreement, and, with that knowledge, then deliberately joined the conspiracy, agreement, or understanding.
> Three: That the object of the conspiracy was to commit one or more of the following offenses as alleged in the Superseding Bill of Indictment: . . . to knowingly make a false statement or representation in the records of a Federal Firearms Licensee in violation of Title 18, United States Code, Sections 924(a)(1)(A).
> Four: At some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment and did so in order to further or advance the purpose of the agreement.

*See* 18 U.S.C. § 371; *United States v. Tedder*, 801 F.2d 1437, 1446 (4th Cir. 1986); 2 O'Malley, *et al.*, Federal Jury Practice and Instructions: Criminal § 31.03 (5th ed. 2000).

The Court also defined several important terms of the essential elements for Count One, including several aspects of the term "conspiracy." Among those instructions, the Court stated:

> To prove that a conspiracy existed . . . the government is not required to show that all of the people named in the indictment as members of the conspiracy were, in fact, parties to the agreement, or that all of the members of the alleged conspiracy were named or charged, or that all of the people whom the evidence shows were actually members of a conspiracy agreed to all of the means or methods set out in

the indictment.

See 2 O'Malley, *et al.*, <u>Federal Jury Practice and Instructions: Criminal</u> § 31.04 (5th ed. 2000).

> Before the jury may find that the defendant, or any other person, became a member of the conspiracy charged in Count One, the evidence in the case must show beyond a reasonable doubt that the defendant knew the purpose or goal of the agreement or understanding and deliberately entered into the agreement intending, in some way, to accomplish the goal or purpose by this common plan or joint action . . . Merely associating with others and discussing common goals, mere similarity of conduct between or among such persons, merely being present at the place where a crime takes place or is discussed, or even knowing about criminal conduct does not, of itself, make someone a member of the conspiracy or a conspirator.

See 2 O'Malley, *et al.*, <u>Federal Jury Practice and Instructions: Criminal</u> § 31.05 (5th ed. 2000).

> A conspiracy . . . would have to include at least two persons as members. For purposes of determining who might be a member of a conspiracy, I instruct you that a government agent, acting openly or as an undercover officer, cannot be found to be a member of a conspiracy. That is also true of a confidential informant acting as such in cooperation with a government agent . . . In other words, by definition, every conspiracy requires at least two culpable, criminally responsible participants. Because there must be at least two culpable parties, a defendant cannot conspire with a government agent since both parties would not have the required mental state - the intent to commit the substantive offense.

See 2 O'Malley, *et al.*, <u>Federal Jury Practice and Instructions: Criminal</u> § 31.02 (5th ed. 2000).

At trial, the Government presented evidence, by way of testimony from Government witnesses Carlos Glover ("Glover") and Randolph Sherman ("Sherman"), that in January 2003, Dedrick entered into a transaction with Glover and Sherman that would enable the sale of an AK-47 assault rifle to Sherman. Sherman was prohibited from purchasing firearms because of a 1995 criminal conviction in New York. Sherman testified that in early January of 2003, he visited Dedrick's store, where Dedrick showed Sherman various firearms. Sherman filled-out the necessary Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Form 4473 paperwork

and attempted to buy the AK-47 rifle in question, but was denied after Dedrick conducted a background check that revealed Sherman was prohibited from purchasing firearms. During Sherman's testimony, the Government produced the Form 4473 that Sherman filled-out at Dedrick's store. A mark on the form, purportedly made by Dedrick, indicated that the background check on Sherman was "delayed." The denial decision resulting from Sherman's background check was made on January 7, 2003.

After Dedrick refused to sell the rifle to Sherman, Sherman left and returned to the store with Glover. Glover testified that Dedrick knew him from previous purchases he had made from Dedrick's store. On this occasion, Sherman handed money to Glover for the purchase of the rifle before the two of them entered the store. Sherman and Glover then entered the store together, where Dedrick handed Sherman the rifle that Sherman had previously attempted to purchase. Sherman inspected the rifle, then put it on the counter and left the store. Dedrick then permitted Glover to purchase the rifle. To complete the transaction, Glover filled-out the necessary Form 4473, stating that he was the purchaser of the rifle. Dedrick signed the form verifying that Dedrick believed Glover to be the actual purchaser of the rifle. During Glover's testimony, the Government produced the Form 4473 that Glover filled-out and he and Dedrick signed. Glover testified that at the time of the transaction, Dedrick informed him that Glover could transfer the rifle to a third party by drafting a "contract" for the "sale" of the firearm to a third party. Glover and Sherman subsequently executed such a "contract" transferring the rifle to Sherman. Although Sherman later entered into other transactions with Dedrick as a government informant, neither he nor Glover were acting on behalf of the government at the time of the January 2003 transaction.

In regard to the Glover event, Defendant Dedrick contends the evidence comes up short in identifying a person or persons who might reasonably have been found by the jury to have been co-conspirators along with Dedrick.

Assuming that Dedrick was the primary participant in a conspiracy with the identified objects, the evidence of Glover's joining it consists only of his participation in this single transaction. It is entirely possible that Glover's participation was merely episodic, that is, that on this one occasion he meant to do the transaction legally, as he was not a prohibited person, even if he would then resell the weapon to Sherman by way of the sale instrument described to him by Dedrick. Or, his aim may have been to deceive Derick, as the Government alleged when it indicted Glover over this very transaction. He may have intended to use Dedrick's inattention or susceptibility to put a sale through. None of these possibilities would make Glover a conspirator. On the other hand, Glover could have perceived Dedrick as a willing accomplice, albeit one gained sub rosa, to go through the motions of a purchase by Glover with the joint intent that possession of the weapon go to Sherman in a straw purchase. As a rational jury could have concluded the latter, Glover could be the necessary second member of the conspiracy. The jury could have found likewise that Sherman formed a joint, unstated intent with Dedrick to conclude a straw purchase.

The foregoing evidence, involving as it did, a single discrete event, may be said to provide scant evidence of a conspiracy, in the sense of one existing at the particular point in time and then joined by Glover or Sherman or both. Participation by the latter could be taken as more akin to participation in a substantive offense or aiding and abetting such an offense than as tacit participation by individuals acting as co-conspirators. But that was left to the jury. The

Government argues persuasively that the analysis supporting a conclusion that Dedrick participated in a conspiracy must go on to include the other offense conduct of which the jury found Dedrick guilty, including the charges naming Rasmussen. It cites United States v. Whaley, 830 F.2d 1469,1473 (7th Cir. 1987) as holding that "recurring patterns of illegal activity are strong circumstantial evidence of a conspiratorial agreement."

Rusmussen never testified, but appeared in events shown to the jury by way of videotape. Although all charges against him in this Bill Of Indictment were dismissed, he was initially charged herein along with Assault Technologies in substantive Counts Six, Seven, and Eight. He alone was charged in Count Ten. Of these counts, Dedrick was charged along with Rasmussen only in substantive Count Six and conspiracy Count One. The Government contends there is evidence to support a jury finding that Rasmussen could have been seen by the jury as a member of a conspiracy with Dedrick, supplying the needed role of second co-conspirator by his participation in a series of actions.

Although the evidence did not indicate any conspiratiorial talk as such between Dedrick and Rasmussen, it did show that the two discussed the notion of disregarding the source of payment for guns in connection with potential straw purchases. Such discussions, and the actions of both men, together with the testimony of Dedrick himself, through wich the jury had the opportunity to evaluate Dedrick's and derivatively Rasmussen's state of mind, provided a basis for a finding of a conspiracy in which Dedrick and Rasmussen were members.

Viewing the evidence in the light most favorable to the Government, the Court finds that the evidence presented against Dedrick satisfies all of the essential elements of Count One. Specifically, the Court finds that the evidence involving the transaction between Dedrick, Glover,

and Sherman could be taken by the jury as demonstrating that: i) Dedrick knew that Sherman was the intended purchaser of the rifle in question; ii) that Dedrick came to an unspoken agreement with Glover to help Sherman obtain the rifle through Glover; iii) that Dedrick and Glover tacitly agreed that in order for Dedrick to transfer the rifle to Sherman, Glover would need to sign falsely the ATF Form 4473 stating that Glover was the actual purchaser of the rifle; and iv) that Dedrick helped Sherman obtain the rifle by Dedrick's signing the Form 4473 that was submitted by Glover, despite Dedrick's knowledge that the rifle was for Sherman.

Therefore, the Court finds that the evidence was sufficient to sustain the jury verdict against Dedrick for Count One.

**B.  Count Five and Six: Falsification of Records of a Federal Firearms Licensee in Violation of 18 U.S.C. § 924(a)(1)(A) and/or Aiding and Abetting the Same in Violation of 18 U.S.C. § 2**

Dedrick contends that the jury verdicts against him as to Counts Five and Six should be set aside because: (1) as to the firearms at issue in Counts Five and Six, the evidence presented by the Government demonstrated that the actual purchaser of the firearms was ATF Agent Sheri Hamlin, not Randolph Sherman, and Hamlin did not actually intend to purchase the firearms for Sherman; and (2) the Government presented insufficient evidence to prove that Dedrick believed that Hamlin intended to purchase the firearms on Sherman's behalf.  (Def. Motion to Set Aside Jury Verdicts ¶¶ 5, 6).

Count Five of the Government's Superseding Bill of Indictment reads in relevant part:

On or about November 13, 2003, in Union County, within the Western District of North Carolina, and elsewhere, the defendants, (1) Daniel Dedrick; (3) D&C's Assault Technologies, Inc., aiding and abetting each other and others known and unknown to the Grand Jury, did knowingly make false statements and representations with respect to information required by the provisions of Chapter

44, of Title 18, United States Code, to be kept in the records of defendant D&C's Assault Technologies, Inc., a licensed dealer in firearms under the provisions of Chapter 44 of Title 18, United States Code, in that the defendants did execute a Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473, Firearms Transaction Record, with straw purchaser information, to the effect that Mr. S.'s female friend was the actual purchaser of the Colt .223 caliber rifle, whereas in truth and in fact, Mr. S.'s female friend was making the purchase on behalf of Mr. S. who had previously been denied by the Brady check. All in violation of Title 18, United States Code, Sections 2 and 924 (a)(1)(A).

(Superseding Bill of Indictment pp. 7-8).

Count Six of the Government's Superseding Bill of Indictment reads in relevant part:

On or about December 16, 2003, in Union County, within the Western District of North Carolina, and elsewhere, the defendants, (1) Daniel Dedrick; (2) John Wesley Rasmussen, II; (3) D&C's Assault Technologies, Inc., aiding and abetting each other and others known and unknown to the Grand Jury, did knowingly make false statements and representations with respect to information required by the provisions of Chapter 44, of Title 18, United States Code, to be kept in the records of defendant D&C's Assault Technologies, Inc., a licensed dealer in firearms under the provisions of Chapter 44 of Title 18, United States Code, in that the defendants did execute a Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473, Firearms Transaction Record, with straw purchaser information, to the effect that Mr. S.'s female friend was the actual purchaser of the Cugir rifle, whereas in truth and in fact, Mr. S.'s female friend was making the purchase on behalf of Mr. S. who had previously been denied by the Brady check. All in violation of Title 18, United States Code, Sections 2 and 924 (a)(1)(A).

(Superseding Bill of Indictment p. 8).

The Court stated in its instructions to the jury, that in order for the jury to find Defendant Dedrick guilty of Counts Five and Six, Falsification of Records of a Federal Firearms Licensee in Violation of 18 U.S.C. § 924(a)(1)(A) and/or Aiding and Abetting the Same in Violation of 18 U.S.C. § 2, the Government must prove the following essential elements beyond a reasonable doubt:

One: That the entity named as a Federally Licensed Firearms dealer in the

11

Superseding Bill of Indictment, D&C's Assault Technologies, Inc., was a Federally Licensed Firearms dealer at the time the alleged offense occurred;

- For Count Five, the date alleged is November 13, 2003.
- For Count Six, the date alleged is December 16, 2003.

Two: That the defendant made a false statement or representation in the firearm records that the licensed firearms dealer was required by federal law to maintain;
Three: That the defendant made the false statement or representation with knowledge of the falsity; or
Four: The Defendant otherwise aided, abetted, counseled, commanded, induced, or procured the commission of this offense.

*See* 18 U.S.C. §§ 2, 924(a)(1)(A); Pattern Crim. Jury Instr. 11th Cir. OI 35.1 (2003).

The Court defined "aiding and abetting" as follows:

> The law holds one who knowingly "aids, abets, counsels, commands, induces or procures" the commission of a crime just as criminally responsible as the one who actually commits it.
>
> To be convicted of "aiding and abetting", the government is not required to prove participation at every stage of an illegal venture. However, the government is required to prove that the defendant knowingly associated himself with and participated in the criminal venture. In other words, you should only find the defendant guilty if the evidence proves beyond a reasonable doubt that he knowingly participated in the principal's criminal intent.
>
> Finally, under the law, it is not necessary that the principal (that is, the one who actually committed the crime) be convicted for you to find the defendant guilty of "aiding and abetting."

*See United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983).

At trial, the Government presented evidence, by way of testimony from Sherman and ATF agent Sheri Hamlin ("Hamlin"), that on November 13, 2003 and December 16, 2003, Sherman, acting as a confidential informant, and Hamlin, who was working as an undercover agent, visited Dedrick's store to purchase firearms. During those transactions, Sherman selected certain firearms, and Hamlin purchased those firearms from Dedrick using her undercover identity.

During Sherman's testimony, the Government presented a video recording with audio

depicting a November 5, 2003 visit by Sherman to Dedrick's store. The recording was made by a hidden camera placed on Sherman's person by the Government. The recording depicts an attempt by Sherman to purchase a Colt .223 rifle from Dedrick. Like the January 2003 purchase attempt described by Sherman, the recording shows that Dedrick refused to sell the rifle to Sherman because his background check was "delayed." After Dedrick refused to sell the rifle to Sherman, Dedrick asked Sherman if he wanted to pay for the rifle in advance, to which Sherman responded that Dedrick should hold onto the rifle and not sell it to someone else because he intended to return for it. The Government then presented a November 13, 2003 recorded telephone conversation between Dedrick and Sherman. During the telephone conversation, Dedrick informed Sherman that his November 5, 2003 background check indicated Sherman was "denied" from purchasing the rifle. Sherman responded by asking whether Dedrick still had the rifle in his possession, to which Dedrick replied, "oh, yeah." Sherman then stated that he would come to Dedrick's store soon.

Following the telephone recording, the Government presented a video recording with audio that depicted a November 13, 2003 visit by Sherman and Hamlin to Dedrick's store. The November 13 recording was made by a hidden camera on Hamlin's person. In the recording, Dedrick hands to Sherman the same rifle that Sherman tried to purchase on November 5. Sherman then hands the rifle to Hamlin, who purchases the rifle from Dedrick. Before Hamlin makes the purchase, the recording depicts Dedrick asking Sherman "this [indicating the rifle] is for her, right?" Sherman and Hamlin respond by laughing, then Hamlin states, "[t]his is for me." Hamlin then proceeds to fill-out the Form 4473 with her undercover identification, stating that she is the purchaser of the rifle. Dedrick signed the form indicating that he believed Hamlin to

be the actual purchaser of the rifle. During Hamlin's testimony, the Government produced the Form 4473 that Hamlin filled-out and Dedrick signed.

Defendants argue that Dedrick did not make a false statement when he signed the Form 4473 stating that he believed Hamlin to be the actual purchaser of the rifle. (Def. Motion to Set Aside Jury Verdicts ¶ 5). Defendants contend that Hamlin was the actual purchaser because Hamlin did not actually intend for Sherman to purchase and possess the rifle. (*Id*.). However, as the Government demonstrated at trial, Dedrick was unaware that Hamlin was in reality an undercover ATF agent involved in a sting operation. According to the information available to Dedrick, Sherman was the intended purchaser of the rifle. Therefore, Dedrick's signed statement stating that he believed Hamlin to be the actual purchaser of the rifle was false.

More specifically, the Government presented evidence regarding the contents of the Form 4473 on which Dedrick made his false statement. Government witness Jaime Morosky, an industry operations investigator with ATF, testified that in order to complete a Form 4473, the transferor of a firearm must sign his or her name under the following representation, "[i]t is my belief that it is not unlawful for me to sell, deliver, transport or otherwise dispose of the firearm listed on this form to the person identified in Section A (indicating the person who purchases the firearm)." The Government demonstrated through Morosky's testimony that the Form 4473 specifically stated in Notice 1 under the heading "Important Notices" that an "actual buyer" is a person intending to purchase the firearm for himself or herself. The Government further demonstrated through Morosky that the Form 4473 provided an example of a prohibited transaction under the heading "Actual buyer examples." The example stated, "Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the

firearm.  Mr. Jones is not the actual buyer of the firearm . . . The licensee may not transfer the firearm to Mr. Jones."

Thus, at the time Dedrick made his signed affirmation on the Form 4473 involved in the November 13, 2003 transaction, he was stating that he believed that it was not unlawful to transfer the rifle to Hamlin.  Dedrick made this affirmation even though the transaction, according to the information available to Dedrick, was essentially identical to the example of the prohibited transaction provided on the Form 4473.  Additionally, the evidence presented by the Government demonstrated that Dedrick knew Sherman to be a person prohibited from purchasing a firearm, that Sherman had attempted to purchase the rifle in question from Dedrick on a prior occasion, and that after Dedrick refused to sell the rifle directly to Sherman, Dedrick sold the rifle to Sherman through Hamlin when Sherman returned to the store with the ostensible intent of obtaining the rifle for himself.

The Government then presented a video recording with audio depicting a December 4, 2003 visit by Sherman to Dedrick's store.  The recording was made by a hidden camera on Sherman's person.  In the recording, Sherman tells Dedrick that he would like a receipt for the rifle he purchased on November 13.  The Government emphasized in its direct examination of Sherman that Sherman asked Dedrick for a receipt to the rifle "he," meaning Sherman, purchased on November 13.  Dedrick did not provide Sherman the requested receipt.  Agent Hamlin explained during her testimony that the purpose of Sherman's December 4 visit was to confirm that Dedrick knew Sherman had taken possession of the rifle.

The Government then presented a video recording with audio that depicted a December 16, 2003 visit by Sherman and Hamlin to Dedrick's store.  The December 16 recording was made

by a hidden camera on Hamlin's person. The video recording depicts Dedrick as well as Dedrick's employee and co-defendant, John Wesley Rasmussen, present in the store. In the recording, Dedrick states that he remembered Hamlin. Hamlin then asks Dedrick for a receipt for the rifle that was purchased on November 13. Dedrick complies by providing a receipt to Hamlin. Also during the visit, Sherman views and handles a new rifle, which he subsequently purchases by handing cash to Rasmussen. Like the November 13 transaction, Hamlin fills out the Form 4473 with her undercover identification, stating that she is the purchaser of the rifle. Rasmussen signed the form indicating that he believed Hamlin to be the actual purchaser of the rifle. During Hamlin's testimony, the Government produced the Form 4473 that Hamlin filled-out and Rasmussen signed.

Viewing the evidence in the light most favorable to the Government, the Court finds that the evidence presented against Dedrick regarding the transaction on November 13, 2003 that involved Dedrick, Sherman, and Agent Hamlin satisfied all of the essential elements of Count Five, Falsification of Records of a Federal Firearms Licensee. The Court also finds that the evidence presented against Dedrick regarding the transaction on December 16, 2003 that involved Dedrick, Rasmussen, Sherman, and Hamlin satisfied all of the essential elements of Count Six. Specifically, the Court finds that the Government presented sufficient evidence to demonstrate that Dedrick understood Sherman to be the intended purchaser of the rifle in question on November 13, 2003, and that despite this knowledge, Dedrick signed the ATF Form 4473 indicating that he believed Hamlin to be the actual purchaser. Likewise, the Court finds that the Government presented sufficient evidence to demonstrate that Dedrick aided and abetted the December 16, 2003 transaction in which Sherman and Hamlin purchased a second rifle from

Dedrick's employee, Rasmussen. The Government presented evidence that the December 16 transaction occurred in Dedrick's presence and that at the time of the transaction, Dedrick remembered Sherman and Hamlin and the circumstances of their November 13 purchase, and that despite this knowledge, he allowed them to complete a second purchase in his store. Therefore, the Court finds that the evidence was sufficient to sustain the jury verdicts against Dedrick for Counts Five and Six.

Defendant contends, however, that certain language used in the indictments works against conviction as to Counts Five and Six. Specifically, he refers, as in the case of Count Five, to the language: "...straw purchaser information, to the effect that Mr. Sherman's female friend was the actual purchaser of the Colt .223 caliber rifle, whereas in truth and in fact, Mr. Sherman's female friend was making the purchase on behalf of Mr. Sherman...." He objects that the actual truth of the transaction was that Hamlin was not making the purchase for Sherman, but was merely portraying herself as buying it for him.

The Court finds, however, that such language in Counts Five and Six of the Bill Of Indictment is not fatal to conviction. It is true that such language, following "in truth and in fact", does not factually depict what was actually going on, but it does not prejudice him or otherwise serve to weaken his ability to defend himself. At the least such language may be disregarded as surplusage, because the thrust of the allegations in identifying the factual predicate of the charged offense is not placed in doubt. Moreover, it is late in the day for Dedrick to challenge the adequacy of the indictment.

## C. Count Thirteen: Possession of a Machine Gun in Violation of 18 U.S.C. § 922(o)

Dedrick contends that the jury verdict against him for Count Thirteen should be set aside

because: (1) Dedrick presented exculpatory evidence in the form of a permit issued by the Union County Sheriff's Office allowing Dedrick to legally possess machine guns; (2) the Government failed to present any evidence to establish an interstate commerce nexus; and (3) the Government presented insufficient evidence to demonstrate that Dedrick knowingly possessed the machine gun in question. (Def. Motion to Set Aside Jury Verdicts ¶¶ 8, 9, 10).

Count Thirteen of the Government's Superseding Bill of Indictment reads in relevant part:

> On or about June 7, 2005, in Union County, within the Western District of North Carolina, and elsewhere, the defendant, Daniel Dedrick, did knowingly and unlawfully possess in interstate and foreign commerce a machine gun, namely an AK-type, 7.62 mm caliber machine gun.

(Superseding Bill of Indictment, p. 11).

The Court stated in its instructions to the jury, that in order for the jury to find Defendant Dedrick guilty of Count Thirteen, Possession of a Machine Gun in Violation of 18 U.S.C. § 922(o), the Government must prove the following essential elements beyond a reasonable doubt:

> **One:** That the defendant knowingly possessed a "machine gun," as defined by the statute, on or about the time alleged in the indictment; and
> **Two:** That the defendant knew the firearm was a "machine gun," as defined by the statute.

*See* 18 U.S.C. § 922(o); Pattern Crim. Jury Instr. 11th Cir. OI 34.8 (2003).

The Court defined "machine gun" as follows:

> The term "machine gun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

*See* 26 U.S.C. § 5845(b); Pattern Crim. Jury Instr. 11th Cir. OI 34.8 (2003).

At trial, Government witness Chris Guffey, a crime scene investigator with the Union

18

County Sheriff's Office, testified that the rifle involved in Count Thirteen was found during a consent search of Dedrick's residence that occurred on June 7, 2005. Guffey testified that the search of Dedrick's residence followed a search by local and federal agents of Dedrick's store, Assault Technologies, that occurred earlier in the day on June 7, 2005. Upon arriving at the residence with another officer, Guffey testified that Dedrick's fiancé answered the door and consented to the search. Guffey stated that, following standard search procedures, the officers began their search on the second floor of the two-story residence. After searching the second floor and finding dozens of legal firearms throughout the residence, Guffey testified that the rifle in question was found on the first floor in the laundry room, where it was "crammed" between a dryer and the laundry room wall. Guffey found the rifle enclosed in a nylon rifle case and partially covered by duffle bags that were on top of the washer and dryer units. After discovering the rifle and removing it from the nylon case, Guffey stated that, based on his training and experience, he immediately suspected the rifle to be a fully-automatic machine gun. Guffey stated that the rifle in question, an AK-47 model, included a third position on its selector switch that typically indicates such a rifle is capable of fully automatic firing. Guffey testified that after he determined that the rifle was unloaded and safe, he conducted a field test of the rifle at the residence to confirm his suspicion that it was a machine gun. Guffey stated that the field test confirmed his suspicion, and that he then contacted ATF officials to have them inspect the rifle to further verify his opinion.

Following Guffey's testimony, the Government presented ATF agent Michael Curtis as an expert witness on the identification of firearms. Curtis testified that he was sent by ATF to Dedrick's residence on June 7, 2005 to inspect the rifle recovered by Guffey. Curtis testified that

after examining the rifle, he was certain that it was a machine gun.  Curtis stated that he made his

confirmation in a matter of seconds after examining the selector switch and cross pin (also

known as a "sear pin") on the rifle.  Curtis testified that the selector switch and cross pin are the

key components on AK-47 rifle models to determine whether an AK-47 is capable of automatic

firing.  After the rifle was taken into possession by law enforcement, Curtis testified that the rifle

was tested at an ATF facility to further confirm that the rifle was a machine gun.  Based on his

training and experience, Curtis also testified that the rifle was manufactured in Romania due to

the rifle's distinctive markings.[3]

   As its final witness, the Government called ATF agent Denise Brown.  Agent Brown

stated that she was employed by the National Firearms Branch of ATF, which is responsible for

maintaining a registry database of all firearms required to be registered by the federal

government, including machine guns.  Agent Brown testified that a search of the rifle recovered

from Dedrick's residence revealed that it was not registered in the federal database.  Agent

Brown further testified that numerous other machine guns were registered in the database under

Dedrick's name, including an AK-47 model rifle.  However, Agent Brown testified that the AK-

---

[3]Dedrick contends that he should be "acquitted on Count Thirteen because the government failed to present any evidence to establish an interstate commerce nexus" with regard to the rifle involved in Count Thirteen.  (Def. Motion to Set Aside Jury Verdicts ¶ 9).  However, the statute that Dedrick is charged with violating in Count Thirteen, 18 U.S.C. § 922(o), does not require that a machine gun travel in interstate commerce.  *See United States v. Haney*, 264 F.3d 1161, 1166-67 (10th Cir. 2001) (noting that § 922(o) does not require the Government to present evidence that the possession of a machine gun affects interstate commerce).  Therefore, this argument is without merit. *See United States v. Oliver*, 208 F.3d 211, 2000 WL 263954, at *3 (4th Cir. 2000) (unpublished) ("[Defendant] argues that the Government did not present evidence of an interstate nexus with regard to the charge of possession of a silencer in violation of [the relevant statute].  Because there is no requirement that the weapon traveled in interstate commerce under this statute, his claim lacks merit.") (citations omitted).

The Court notes that although the Government is not required to present evidence that the machine gun possessed by Dedrick traveled in interstate commerce, the Government has nevertheless presented such evidence through Agent Curtis's testimony that the rifle was manufactured in Romania.

47 that was registered to Dedrick was not the same rifle as the one that was recovered from Dedrick's residence.

In defense against Count Thirteen, Dedrick presented former Union County Sheriff Frank McGuirt. Sheriff McGuirt testified that he issued to Dedrick a permit under North Carolina state law that allowed Dedrick to possess "a machine gun and other like weapons for scientific and experimental purposes." Dedrick produced the permit as evidence. On cross-examination, however, Sheriff McGuirt testified that the permit did not exempt Dedrick from complying with the federal laws pertaining to machine gun possession. Additionally, after testifying in his own defense, Dedrick himself admitted during cross-examination that the permit issued by Sheriff McGuirt did not exempt him from complying with federal laws. The Government's line of questioning was as follows:

> Government attorney: [Do] you agree that you understand that Exhibit 5 [the permit issued by Sheriff McGuirt] does not exempt you from compliance with federal law, correct?
> Dedrick: No, not at all.
> Government attorney: No it doesn't exempt you?
> Dedrick: No it doesn't exempt me.

Dedrick also testified during direct examination that he was a Class 3 firearms dealer, which permitted him to sell machine guns to law enforcement and other persons or entities permitted to purchase and possess such firearms, including other Class 3 firearms dealers. Dedrick stated that "there's huge money" in selling registered machine guns. Dedrick also stated that as a Class 3 dealer, he was familiar with the paperwork necessary for possessing and transferring machine guns, and that he personally owned as many as 67 legally registered machine guns. On cross-examination, Dedrick reiterated his knowledge of machine guns and the

accompanying federal laws for possessing and transferring them.  Notably, Dedrick admitted

during cross-examination that the rifle involved in Count Thirteen was a machine gun, that he in

fact possessed the rifle on the date it was seized from his residence, June 7, 2005, that the rifle

was not registered on June 7, 2005, and that possessing an unregistered machine gun is unlawful.

Thus, given the evidence presented by the Government, the testimony of Defense witness

Sheriff McGuirt, and Dedrick's own admissions, there is no factual basis for finding that Dedrick

even believed the permit issued by Sheriff McGuirt allowed him to legally possess the rifle in

question, let alone whether the permit actually permitted such possession.  The law is well

established that in order for a Class 3 firearms dealer such as Dedrick to possess a particular

machine gun, such a firearm must be registered with federal authorities.  *See United States v.*

*Jones*, 976 F.2d 176, 183 (4th Cir. 1992) (noting the validity of mandatory registration

requirements for machine guns).  The evidence is incontrovertible that the rifle found at

Dedrick's residence was a machine gun, and that it was unregistered at the time it was recovered

by law enforcement.  Therefore, Dedrick's contention that the permit issued by Sheriff McGuirt

entitled him to legally possess the machine gun at issue in Count Thirteen is both legally and

factually without merit.

Dedrick's final argument that he should be acquitted on Count Thirteen rests on whether

the Government presented sufficient evidence to demonstrate that Dedrick knew the rifle he

possessed was a machine gun.  Dedrick contended at trial and contends in his motion for

acquittal that he was not aware that the rifle was a machine gun at the time he possessed it.  (Def.

Motion to Set Aside Jury Verdicts ¶ 10).

To support his defense that he was unaware the rifle was a machine gun, Dedrick

presented Officer Jerry Hedspeath of the Town of Matthew's Police Department. Hedspeath testified that he sold the rifle to Dedrick in May of 2004 after purchasing the rifle from "a [firearms] dealer at a gun show at the fairgrounds." Hedspeath stated that he did not know that the rifle was a machine gun, and that no one, including the dealer who sold him the rifle, ever informed him that the rifle was a machine gun. Hedspeath also stated that he never fired the rifle, never tested the rifle's functions in any way, and never took the rifle apart to examine the contents inside the rifle. He further stated, "[the] only thing I did with the weapon, I cleaned it. I cleaned it with some break cleaner." Hedspeath explained hat he sold the rifle to Dedrick because he "needed some money to pay some bills."

On cross-examination, Hedspeath clarified his previous statements regarding the purchase of the rifle, stating that he purchased it from a firearms dealer at the Mecklenburg County fairgrounds in 1998, and that he sold it to Dedrick in "2004 or 2005." Hedspeath further testified on cross-examination that the rifle was rusted when he purchased it in 1998. Hedspeath stated that in order to improve the rifle's appearance, he painted the rifle's exterior, including the three position selector switch.

Hedspeath provided inconsistent statements regarding the relative prices for which he bought and sold the rifle. During cross-examination, Hedspeath initially testified that he bought the rifle in 1998 for "$150 to 200." After being confronted by the Government attorney about his previous statements concerning his purchase of the rifle, Hedspeath admitted that during his first interview with law enforcement he stated that he bought the rifle for $200. Hedspeath also admitted that during a subsequent interview with the cross-examining Government attorney and Agent Hamlin, he stated that he bought the rifle for "$75 as a parts gun." After the Government

attorney revealed his inconsistent statements, Hedspeath stated that he indeed bought the rifle for $75.

Hedspeath then testified on cross-examination that he believed the market value for a semi-automatic AK-47 in good condition to be $250 to $300. Hedspeath also testified that he believed the market value for a legally transferrable, fully-automatic AK-47 in good condition to be $1500 to $2000 "or possibly more." After this line of questioning, the Government asked Hedspeath whether he recalled the price for which he sold the rifle to Dedrick. Hedspeath stated that he sold the rifle for $250. When the Government began to examine Hedspeath about a previous statement he made concerning the rifle's sale price, Hedspeath interrupted the Government attorney, stating "I know what I stated. I stated $500 at the interview but that's not correct." Upon further cross-examination, Hedspeath admitted that it would be illogical to sell a semi-automatic AK-47 for $500, and that in a pre-trial interview with Agent Hamlin, he in fact stated that he sold the rifle to Dedrick for $500. Hedspeath admitted that he could not explain why he told Hamlin that he sold the rifle to Dedrick for $500. Hedspeath also admitted stating in a pre-trial interview that, at the time he sold the rifle, he needed a specific amount of money because he was in "dire straits." Hedspeath admitted stating that he needed $400 for auto insurance and $85 for his power bill. Dedrick's attorneys did not seek redirect examination of Hedspeath.

Dedrick also testified in his own defense regarding his knowledge that the rifle was a machine gun. Dedrick confirmed on direct examination that he purchased the rifle in question second-hand from Hedspeath, whom Dedrick described as a frequent customer. Dedrick testified that he did not examine the rifle carefully when Hedspeath sold it to him and that he had no

reason to suspect that it was a machine gun because he considered Hedspeath, as a police officer and loyal customer, to be trustworthy. Dedrick testified that he did not recall how much he paid for the rifle, stating that "I remember he came in asking for $500. I think I talked him down less than that. But I deal in so many numbers, I couldn't tell you." Dedrick also testified that several AK-47 models have a three position selector switch to make them look fully-automatic, even though they are actually semi-automatic. He stated that such designs were intended to fool the "average person." To bolster his testimony, Dedrick presented into evidence a semi-automatic AK-47 with a three position selector switch. He explained that the rifle he was presenting was only capable of semi-automatic firing even when the selector switch was placed in a position that would indicate fully-automatic firing in a machine gun.

During cross-examination, the Government presented into evidence a Form 4473 that Dedrick admitted to filling-out and using as a "trade-in form" to record his purchase of the rifle from Hedspeath. Dedrick admitted to recording information about the rifle onto the form, including the rifle's serial number. Dedrick admitted that the location of the serial number on the rifle was "about four inches away" from the sear pin on the rifle.[4] However, Dedrick explained that he did not look at the sear pin because he knew exactly where to find the serial number on the rifle due to his extensive experience with handling AK-47s. The form did not include the price Dedrick paid for the rifle, or the date on which he purchased the rifle.

After the close of Dedrick's case, the Government presented Government expert Michael Curtis as a rebuttal witness. Curtis testified that according to his recent research of the current

---

[4] The Court notes that previous testimony by Government expert Michael Curtis established that the sear pin on an AK-47 rifle is a key component to determining whether an AK-47 rifle is capable of automatic firing.

market in the United States for new semi-automatic AK-47s, such rifles retail for $250. Curtis also testified that the price range in the current national market for a legally transferrable, fully-automatic AK-47 is $15,000 to $17,500. Curtis also testified as to his opinion of the semi-automatic AK-47 that Dedrick presented into evidence. After examining the rifle, Curtis testified that it had substantial after-market alterations. Specifically, Curtis testified that the rifle was manufactured in Russia, but the selector switch positions were marked with Chinese characters. Curtis characterized the rifle as a poor attempt to replicate an authentic automatic AK-47 rifle, and that, in his experience, he had never seen another firearm like the one presented by Dedrick.

Viewing the evidence in the light most favorable to the Government, the Court finds that the Government presented sufficient evidence to demonstrate that Dedrick knew that the rifle he admitted to possessing on June 7, 2005 was a machine gun. Specifically, the Court notes that the following evidence sufficiently demonstrated Dedrick's knowledge that the rifle was a machine gun: Government witness Christopher Guffey's testimony that the rifle was discovered hidden in the laundry room of Dedrick's residence; Guffey's and Government expert Curtis's testimonies that, upon first inspection, they immediately suspected that the rifle was a machine gun; the vague and inconsistent statements by Defense witness Hedspeath and Dedrick regarding the circumstances involved in the transfer of the rifle from Hedspeath to Dedrick; and Dedrick's own admitted knowledge of machine guns. Therefore, the Court finds that the Government presented sufficient evidence to sustain the jury verdict against Dedrick for Count Thirteen.

**D. Counts Against D&C's Assault Technologies, Inc.**

Corporate Defendant Assault Technologies contends that the jury verdicts against it as to Counts Five, Six, Seven, Eight, Nine, Eleven, and Twelve should be set aside. (Def. Motion to

Set Aside Jury Verdicts ¶¶ 11, 12, 13).

With regard to corporate defendants, the Court gave the following instruction to the jury:

The Superseding Bill of Indictment charges defendant D&C's Assault Technologies, Inc. with engaging in certain criminal acts. A corporation is a legal entity that may act only through its employees or agents who are authorized by the corporation to act for it.

A corporate defendant is entitled to the same individual and impartial consideration of the evidence that the jury gives to a personal defendant. A corporation may be found guilty of the offense charged or be found not guilty of the offense charged under the same instructions that apply to a personal defendant.

In order to sustain its burden of proof for the crimes charged against defendant D&C's Assault Technologies, the Government must prove to you, beyond a reasonable doubt, that each of the essential elements of the offense at issue was committed by an employee or agent of the corporation. In addition, the Government must also establish the following two elements beyond a reasonable doubt as to defendant D&C's Assault Technologies:

First:  That each of the acts committed by the employee or agent of the company were within the course and scope of the employment given to that person by the company, and

Second:  That the employee or agent committed each of the essential elements of the offense with the intent to benefit the company.

In order to establish that an act was committed or omitted within the course and scope of employment, the evidence must show that the act or omission related directly to the general duties that this employee was expected to perform by the defendant corporation. It is not necessary for the Government to prove that the act was authorized by the corporation formally or in writing.

An employee or agent is not acting within the course and scope of his or her employment, however, if that person performs or omits to perform an act which defendant corporation has, in good faith, forbidden or ordered its employees or agents to perform. A corporate defendant—like an individual defendant—however, may not avoid responsibility for its actions by meaningless or purely self-serving pronouncements. Similarly a corporate defendant—like an individual defendant—may not be held responsible for acts which it tries to prevent.

An act of an agent may later be adopted by the corporation if another employee or agent of the corporation, with full knowledge of the earlier act and himself or herself acting both with the intention to benefit the corporation and then acting within the course and scope of his or her employment or agency, subsequently approves the earlier act.

*See* 1A O'Malley, *et al.*, <u>Federal Jury Practice and Instructions: Criminal</u> § 18.05 (5th ed. 2000).

Assault Technologies contends that the jury verdicts against it for Counts Five, Six, Eleven, and Twelve should all be set aside for the same reasons that Dedrick argues Counts Five and Six should be set aside as to Dedrick. (Def. Motion to Set Aside Jury Verdicts ¶¶ 11, 13). Counts Five, Six, Eleven, and Twelve all stem from the same transactions involving Dedrick that were described in Counts Five and Six above. (Superseding Bill of Indictment, pp. 7-8, 10-11).

For the same reasons the Court found the evidence against Dedrick sufficient to sustain the jury verdicts against him for Counts Five and Six, the Court finds the evidence against Assault Technologies sufficient to sustain the jury verdicts against it for Counts Five, Six, Eleven, and Twelve. Specifically, the Court finds that the evidence presented by the Government involving the November 13, 2003 transaction between Dedrick, Randolph Sherman, and Sheri Hamlin, sufficient to sustain the jury verdicts against Assault Technologies for Counts Five and Eleven. Likewise, the Court finds that the evidence presented by the Government involving the December 16, 2003 transaction between Rasmussen, Sherman, and Hamlin, which was aided and abetted by Dedrick, sufficient to sustain the jury verdicts against Assault Technologies for Counts Six and Twelve.

Counts Seven, Eight, and Nine implicate Assault Technologies only through the actions of Rasmussen. (Superseding Bill of Indictment, pp. 9-10). Assault Technologies contends that the jury verdicts against it for Counts Seven, Eight, and Nine should all be set aside because: 1) the Government presented insufficient evidence to prove that Rasmussen was acting to benefit Assault Technologies or that he was acting within company policy when engaging in the conduct alleged in Counts Seven, Eight, and Nine; and 2) the Government presented insufficient evidence to demonstrate that Rasmussen knew or had reasonable cause to believe he was selling firearms

to persons other than the ones filling out the Form 4473s. (Def. Motion to Set Aside Jury Verdicts ¶¶ 11, 13).

For the conduct relating to Counts Seven, Eight, and Nine, the Government presented evidence involving undercover federal agents engaging in illicit firearms purchases with Rasmussen. The evidence presented was similar in nature to that which the Government presented against Dedrick for Counts Five and Six. Specifically, for Counts Seven and Eight, the Government presented video and audio recordings of undercover officers engaging in firearms transactions with Rasmussen. The material dates for the transactions were August 16, 2004 for Count Seven, and October 4, 2004 for Count Eight. During the transactions, the evidence demonstrated that Rasmussen had knowledge that a male undercover agent was intending to purchase particular firearms, but despite this knowledge, Rasmussen allowed a female undercover agent who accompanied the male agent to fill-out the Form 4473s for the purchase of the firearms. The Government presented evidence that Rasmussen signed the Form 4473s stating that he believed the female agent to be the actual purchaser of the firearms, despite his knowledge to the contrary. For Count Nine, the evidence involved the same August 16, 2004 transaction that was involved in Count Seven. During that transaction, the Government presented evidence that Rasmussen knew that the undercover male agent was not from North Carolina, and therefore, the male agent was prohibited from purchasing the Glock 9mm pistol that he sought. Despite this knowledge, Rasmussen allowed the male agent's female companion to fill-out the Form 4473 for the purchase of the firearm. Rasmussen signed the Form 4473, which allowed the male agent to obtain the firearm.

In defense against Counts Seven, Eight, and Nine, Defendants' attempted to portray

Rasmussen as a wayward employee. Through the testimony of Dedrick and other defense witnesses, Defendants sought to demonstrate that despite Dedrick's efforts to run Assault Technologies as a reputable business's, Rasmussen frequently flouted the business's rules. Defendants also attempted to portray Rasmussen as occasionally emotionally unstable. However, as discussed above, the Government presented sufficient evidence, if believed, to demonstrate that Dedrick himself was willing to engage in noncompliance with federal laws in the operation of his business. This is true despite the fact, also shown by the evidence, that on a number of occasions Dedrick refused to conclude a sale when presented with direct information that the potential buyer was a prohibited person.[5] The jury could have entertained doubt as to Dedrick's

_____

[5] The evaluation of the nature and quality of evidence relative to its sufficiency invites careful scrutiny, and comment in the instant case, because of the type of investigation mounted by the government. Dedrick was shown by the evidence to be one who likely would decline an open invitation to engage in a straw purchase. None of the witnesses, including the undercover officers and confidential informants testified to explicit conversations with Dedrick evincing a direct intent to evade the law. It might be inferred, therefore, that the investigators decided on a subtle approach to see where he would draw the line-- to test the truthfulness of the firearms licensee not by presenting to him a clear cut opportunity to vouch for an ostensibly illegal transaction, but rather to vouch for an ostensibly legal one. In one instance the undercover officer verbally vouches for her status as the one actually buying the gun. In the scenario presented several times in this case, the anomaly is that if it were too obvious that a straw purchase was being offered, the defendant would turn it down. If the suggestion of a straw purchase is too weak, then the jury might not convict. The government agent found herself in the questionable posture of trying to prove a criminal intent on the part of the defendant but, as nearly as possible, to prove it in the most innocuous way.

Thus, on a question of the sufficiency of the evidence, the court must begin its analysis with the ambiguity intentionally conveyed by the government agent to the defendant, and then look to the strength of the "wink and a nod" in suggesting to the defendant the criminal role of the purported prohibited buyer. Where there is no nod at all, but only the wink, and no actual wink, the defendant's case for insufficiency of the evidence is enhanced. Where the government shows multiple examples of the "wink" scenario, its case gains strength. The "just enough" investigative technique in which the government agents engaged in this case is fairly considered as one factor in the overall evaluation of the evidence for purposes of the defendants motion.

attempt to cast Rasmussen's activities as inconsistent with legitimate company policy. Additionally, the Government presented incontrovertible evidence that Rasmussen engaged in the transactions involved in Counts Seven, Eight, and Nine while on duty as an employee of Assault Technologies and that the revenues from those transactions directly benefitted Assault Technologies. Therefore, viewing the evidence in the light most favorable to the Government, the Court finds that the Government presented sufficient evidence to sustain the jury verdicts against Assault Technologies for Counts Seven, Eight, and Nine.

Defendant, as a witness in his own behalf and through cross-examination of various Government witnesses, attempted throughout the trial to establish that the Government regulations under which he was charged are vague, easily misunderstood, and subject to reasonable interpretations at variance with one another, even to the point that Government agents themselves gave him conflicting accounts of how the instructions and regulations should be applied. Defendant's understanding of the pertinent law was for the jury to determine. The Court is not persuaded that the law is so vague as to defy understanding by a Federally Licensed Firearms dealer or to foreclose meaningful instructions to the jury. It may be that Defendant's protestations about vagueness, made to agents pre-indictment, served to demonstrate not so much the vagueness postulated but Defendant's heightened attention to that particular facet of the firearms business barring straw purchases. If so, this would have worked against his argument. In other words, to the extent his efforts focused on how he, as a reasonable Federally Licensed Firearms dealer, should interpret the straw purchase regulations, the jury may have believed he should have been all the more careful not to cross the line.

In sum, the Court finds that the evidence presented at trial was sufficient to sustain the

jury verdicts on all counts against the Defendants.  Therefore, Defendants' Motions to Set Aside the Jury Verdicts and for Judgments of Acquittal are <u>denied</u>.

**E.  Defendants' Motion for Judicial Determination Regarding Statutory Penalties**

Defendants' Motion for Judicial Determination Regarding Statutory Penalties is inappropriate at this time.  The Court will determine the penalties to impose upon Defendants at Defendants' sentencing hearing, following submission of a Pre-Sentence Report by the United States Probation Officer and argument by the parties.  Therefore, Defendants' Motion for Judicial Determination Regarding Statutory Penalties is <u>denied</u>.

**IV. CONCLUSION**

**IT IS, THEREFORE, ORDERED** that Defendants' Motions to Set Aside the Jury Verdicts and for Judgments of Acquittal are hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Judicial Determination Regarding Statutory Penalties is hereby **DENIED**.

Signed: April 9, 2009

Richard L. Voorhees
United States District Judge